Arthur Rubel v. Commissioner. Sarah Rubel v. Commissioner.
Rubel v. Commissioner
Docket Nos. 43375, 43376.
United States Tax Court
T.C. Memo 1954-135; 1954 Tax Ct. Memo LEXIS 113; 13 T.C.M. (CCH) 827; T.C.M. (RIA) 54241; August 23, 1954, Filed *113 Held, a bad debt resulting from a payment by a beer distributor to a supplier in order to obtain a shipment of beer was related to the taxpayer's business and is deductible by him as a business bad debt under section 23(k)(1), Internal Revenue Code. Frank L. Scofield, Esq., 308 Littlefield Building, Austin, Tex., for the petitioners. Jackson L. Bailey, Esq., for the respondent. TIETJENS
Memorandum Findings of Fact and Opinion TIETJENS, Judge: The respondent determined deficiencies in income tax against petitioner Arthur Rubel in the amounts of $490.31 for 1946 and $2,069.72 for 1947 and against petitioner Sarah Rubel in the amounts of $508.08 for 1946 and *114 $2,098.21 for 1947. The deficiencies resulted principally from the respondent's disallowance of a $10,000 loss deduction from the petitioners' community income for 1947. The question presented is whether a $20,000 payment made in connection with an agreement for the purchase of beer may be treated as a loss under section 23(e)(1) or (e)(2), a business or non-business bad debt under section 23(k)(1) or (k)(4) of the Code, or a part of the purchase price of the beer. The cases were consolidated for hearing and disposition. The petitioners filed separate original and amended income tax returns on a cash basis for the calendar years 1946 and 1947 with the collector of internal revenue for the first collection district of Texas. Each reported half the income of the marital community. Findings of Fact The petitioners are husband and wife. During 1946 and 1947 they lived in Waco, Texas. Between January 1, 1946 and December 1, 1946, Arthur Rubel was a partner with Bert Gardner in a beer distributing business in Waco, doing business under the firm name of Central Beer Distributors (hereafter called Central). On December 1, 1946, the partnership was dissolved and the business was operated *115 as an individual proprietorship through 1947 by Arthur Rubel. In July 1946 Bert Gardner, as purchasing agent for Central, entered into a written agreement with C. R. Woodward, president of the United Breweries, Inc. of Pittston, Pennsylvania (hereafter called United) for the purchase of 24 carloads of beer, the order to be shipped between July and September 1946. The purchase price was fixed at the maximum allowed by the Office of Price Administration on the date of each shipment. The prices were to be f.o.b. railroad, and payment was to be made by sight draft, bill of lading attached. The contract provided that if United failed to comply with its terms, it was to pay Central $500 as liquidated damages for each carload of beer not delivered as agreed. Central reserved the right to cancel the contract prior to any of the shipments. At the same time Gardner entered into a written agreement with Woodward and two other shareholders of United, which provided that Gardner would lend $20,000 to Woodward, individually, and not as president of United. The agreement recited that Woodward personally needed this amount in connection with the forthcoming purchase by United of the Yankee Brewing *116 Company of Pittston, Pennsylvania, and the loan was to be made after the purchase. It also recited that the agreement for the purchase of beer was a consideration for the parties' entering into the loan agreement. As security for the payment of the loan a majority of the stock of United was to be assigned in blank and delivered to an escrow agent for the benefit of Gardner. As additional security Woodward was to give his promissory note for $20,000 to be made payable one day after the date of the agreement and to contain an authorization to confess judgment against the maker. If United failed to comply with its agreement to deliver beer to Central, Woodward was to repay the $20,000 loan immediately. However, if United complied with its agreement Gardner was not to enter judgment or otherwise proceed to collect on the loan, and interest was not to accrue until January 15, 1947. Upon repayment of the loan the promissory note and shares of stock in United were to be returned to Woodward and two other shareholders. There was no indication in the agreement of when the note was to be repaid in the event that United delivered beer to Central as agreed. The loan agreement recited that any *117 failure to comply with its terms was in no way to affect the agreement between Central and United for the delivery of beer. It was also stated that the two agreements were separate undertakings. The loan agreement was entered into by the parties in representative capacities, Gardner representing Central, and Woodward representing United. The purpose of the parties to the agreement in reciting that they were acting individually and in going through the formalities of entering into two contracts was to avoid the effect of the Texas liquor control law which for bade transactions, other than purchase of beer, between wholesale beer distributors and breweries. The $20,000 was lent to United by Central, Woodward's promissory note for this amount was given, and the stock of United was endorsed and placed in escrow as agreed. Only a part of the beer was delivered, and suit was brought against C. R. Woodward as president of United for the recovery of the $20,000. Judgment was obtained and a search made in 1947 for assets of United and of Woodward, but nothing was realized on the judgment. Opinion On their 1947 returns the petitioners claimed a loss deduction of $10,000, representing *118 their share of the $20,000 owed by United. In his statement accompanying the notice of deficiency the respondent treated the amount as though claimed as a business bad debt and disallowed it as such, but allowed the deduction as a non-business bad debt. The respondent's argument is that since the partnership was formed for the sole purpose of buying and selling beer and was not in the business of lending money or financing enterprises, the loss bore no relationship to the partnership's business. We think it is clear from the evidence offered on behalf of the petitioners that the $20,000 payment was directly related to the partnership's obtaining a supply of beer. Although the loan agreement recited that it was separate from the agreement for the purchase of beer, it is evident that the two transactions were related. Gardner testified, and we have found as a fact, that the reason the parties entered into the two agreements was to avoid the possible effect of the Texas liquor control law which forbade dealings, other than the purchase of beer, between beer distributors and breweries. As to the reason for the $20,000 payment, Gardner, who acted as Central's purchasing agent and spent *119 most of his time trying to buy beer in various states, testified as follows: "That money was advanced by the Central Beer Distributing Company of Waco, Texas, in order to secure the purchase of 24 carloads of beer * * *
The purpose of putting up the $20,000 was definitely to secure beer from the United Breweries, Inc. They would not deliver us any beer until we put up the $20,000. It is impossible to stay in business if you have no beer when you are in the beer business." It appears that Central was having trouble obtaining a supply of beer in 1946 and that the payment of $20,000 was necessary to secure a commitment from United for a 24-carload shipment of beer. In our opinion the evidence establishes the requisite relationship between the loss in 1947 and the business of petitioner Arthur Rubel. Stuart Bart, 21 T.C. 880 (1954); William M. Lovering, 21 B.T.A. 1260 (1931). Central Beer Distributors stopped doing business as a partnership on December 1, 1946, and the business was carried on through 1947 by Arthur Rubel as an individual proprietorship. That the partnership which incurred the debt in 1946 was out of existence in 1947 when the debt *120 became worthless does not affect Arthur Rubel's right to the deduction, since upon dissolution of the partnership his share of the debt owed to the partnership was distributable to him and could be deducted by him when it became worthless in 1947, at which time he was still in the beer business. The respondent concedes that the debt became worthless in 1947. We hold it was a business bad debt. Decisions will be entered under Rule 50.