CHARLES W. and JANE D. CARTER, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Carter v. Commissioner
Docket No. 1515-77.
United States Tax Court
T.C. Memo 1979-447; 1979 Tax Ct. Memo LEXIS 79; 39 T.C.M. (CCH) 456; T.C.M. (RIA) 79447; November 8, 1979, Filed *79 Petitioner started two companies primarily in order to provide himself with a salary rather than as an investment. Petitioner loaned money to two key employees to invest in the companies. These loans become uncollectible. Held: the loans were made predominately to protect petitioner's status as an employee and are deductible as business bad debts. *80 Charles W. Carter, pro se. Joan Ronder Domike, for the respondent. IRWIN
MEMORANDUM FINDINGS OF FACT AND OPINION IRWIN, Judge: Respondent determined a deficiency of $1,999.89 in petitioners' income tax for the taxable year 1972 and an addition to tax pursuant to section 6651(a) [1] of $994.45. Respondent has conceded that petitioners are not liable for the addition to tax. The only issue remaining is whether losses arising from two loans made by petitioner, Charles W. Carter, must be treated as nonbusiness bad debts rather than as business bad debts. FINDINGS OF FACT Some of the facts have been stipulated. The stipulation of facts and the exhibit attached thereto are incorporated herein by this reference. Petitioners, Charles W. and Jane D. Carter, husband and wife, filed a joint return for the taxable year 1972 with the Office of Internal Revenue Service at Holtsville, New York. At the time the petition herein was filed, petitioners resided in Miller Place, New York. Because Jane D. Carter is a petitioner herein solely *81 by reason of having filed a joint return, references to petitioner hereafter are to Charles W. Carter. Petitioner was president and sole stockholder of SHS International of New York City, Inc. (hereafter SHS-New York) at the time it was incorporated. Petitioner owned a 95 percent interest in SHS International of Long Island, Inc. (hereafter SHS-Long Island) at the time it was incorporated. The remaining 5 percent interest was owned by his wife. SHS-Lng Island was incorporated in 1967 and SHS-New York was incorporated approximately 18 months later. Both ofthe corporations were franchised personnel agencies engaged in placing executives, accountants, engineers, secretaries, and clerical workers. The franchisors provided the franchisees with management and counselor training, operational guidance and contacts with various companies. The franchisees were also to benefit from a national advertising campaign by the franchisor which, however, did not materialize. Prior to the time petitioner organized these corporations he had been a schoolteacher. Upon the corporations opening for business in 1967 and 1968 he devoted all his time to running the corporations. It was his hope *82 that the businesses would provide him with a salary and, eventually, dividends (although the desire for dividends was for the future rather than for the present). In mid-September 1970, however, petitioner returned to the school system as an administrator. Petitioner initially invested $20,000 in the capital stock of SHS-New York. This amount included an investment in the franchised agency as well as start-up costs, rental, salaries, forms, telephones, telephone deposits, and similar expenses. Between 1967 and 1970, petitioner made loans to SHS-New York of $45,000. Approximately $60,000 had been invested in or loaned to SHS-Long Island by 1970. SHS-Long Island had gross receipts of approximately $60,000 in 1967. The two corporations together had gross receipts of approximately $150,000 in 1968, $200,000 in 1969, and $80,000 in 1970. They were never profitable and in 1969 their best year, had a $57 loss.SHS-New York went out of business in late 1970 and SHS-Long Island ceased the personnel agency business in 1971. At one time, in 1969, the corporations employed as many as 35 employees. The employees were generally paid a salary plus commission. Petitioner himself did *83 not draw a salary from either corporation in any of the years 1967 through 1970 except for 1968 when he drew $2,500 from each corporation. He later decided that even this $5,000 had been a mistake. He never drew any commission. Petitioner lived on savings and borrowed money during this time. The corporations never paid a dividend. During 1970, petitioner loaned $5,650 to Joseph Silvestri, an employee of SHS-New York. The outstanding balance on this loan in the amount of $3,890 became uncollectible in 1972. Petitioner also loaned $3,900 in 1970 to John Ramirez, an employee and manager of SHS-Long Island. This loan also became uncollectible in 1972. The loans were made so that Silvestri and Ramirez could purchase stock in the companies in order to insure their commitment and loyalty to the SHS corporations. Silvestri had originally worked for a year and a half for SHS-Long Island as a counselor but in late 1969 or early 1970, he transferred to SHS-New York to become vice-president, office manager and a member of the board of directors of that corporation. He remained there until the corporation went out of business in November 1970. He was paid salary plus commission at *84 both SHS-Long Island and SHS-New York, although his pay was based on a higher formula when he transferred to SHS-New York because of his management position. He was paid approximately $150 per week at SHS-Long Island and was suposed to draw about $200 per week at SHS-New York. As noted above, petitioner loaned Silvestri money so that Silvestri could invest in the company and in 1970 Silvestri did, in fact, invest between $4,500 and $5,600 in SHS-New York. Silvestri was the only person other than petitioner to own stock in SHS-New York. John Ramirez was first employed by SHS-Long Island as a counselor in 1968. During that year he worked strictly on commission and earned $7,000. In 1969, he was promoted to office manager and was made a member of its board of directors. In 1969, Ramirez earned between $15,000-$18,000 and in 1970 earned approximately $8,000-$9,000. In 1970, he invested the $3,900 petitioner loaned him in SHS-Long Island by purchasing stock from the company. Except for petitioner and his wife, Ramirez was the only individual to own stock in SHS-Long Island. OPINION In 1970, petitioner loaned money to two key employees of his wholly-owned corporations (except *85 for a 5 percent interest held by his wife in one of the corporations) so that they could purchase stock in the corporations. Petitioner hoped that by becoming stockholders, the employees would be more committed and loyal to the corporations. Unfortunately for petitioner, neither employee was able to repay the loans and they became worthless in 1972. There is no dispute that petitioner is entitled to a deduction under section 16 for the loans. Respondent contends, however, that petitioner's losses were the result of nonbusiness debts deductible under section 166(d)[2] only as short-term capital losses. Petitioner maintains that the loans were business debts made in order to protect his salary and that the losses are deductible as ordinary losses under section 166(a). [3]
*86 It is well recognized that a employee may establish the requisite business nexus for deductibility of a bad debt under section 166(a). Initially, we must determine the proper test to apply to determine the nexus required. Respondent contends that petitioner must prove that his "dominant" motivation in incurring the debt was to protect his employment, relying on United States v. Generes,405 U.S. 93 (1972). Petitioner contends that a "significant" motivation to protect one's employment is sufficient. We agree with respondent. In United States v. Generes,supra, the Supreme Court held that the dominant motive must be to protect one's employment and that a "significant motivation" is insufficient. See also Scifo v. Commissioner,68 T.C. 714, 723 (1977); Shinefeld v. Commissioner,65 T.C. 1092 (1976). We must first deal with respondent's position that petitioner had only an investment interest in the SHS corporations. Respondkent contends that because petitioner received no salary or commissions from the SHS corporation *87 he was no an employee. We disagree. From the time the corporations opened for business in 1967 and 1968 until mid-September 1970, petitioner devoted all of his time to running the corporations. [4] Petitioner did not draw any salary (except for 1968), but this was because the corporations were unprofitable. He lived on savings and borrowed money. In fact, petitioner had to loan the corporations additional money in order to provide them with needed capital. We think that under these circumstances petitioner's refusal to draw a salary was reasonable and does not detract from his status as an employee (president) at the time the loans were made. This case is distinguishable, therefore, from both Whipple v. Commissioner,373 U.S. 193 (1963), and Millsap v. Commissioner,46 T.C. 751 (1966), *88 affd. 387 F.2d 420 (8th Cir. 1968), relied upon by respondent. In those two cases it was found that the taxpayers were promoters of corporations, instrumental in organizing them, but that the taxpayers' services were for the purpose of producing income in the form of dividends or enhancement in the value of his investment. On that basis, it was held that the taxpayers were not engaged in a trade or business since investing is not a trade or business.In the present case, petitioner formed companies in which he would receive compensation directly for his own services as well as indirectly through the corporation. We hold that petitioner was an employee of the SHS corporations as of 1970 and his status as such elevates his relationship with the corporations beyond mere investment. See Trent v. Commissioner,291 F.2d 669 (2nd Cir. 1961). Accordingly, if petitioner can show that the loans arose from the predominant motive of protection of the trade or business of his employment with the SHS corporations rather than from his activities peculiar to his status as an investor concerned with, and participating in, the conduct of the corporations' business, *89 we must hold for petitioner. We also disagree with respondent's next contention that, even if petitioner was an employee, the loans could not have been made as a condition to continuing his employment because petitioner was in control of the corporation and could, therefore, always obtain a position with the corporations. Where an employee-shareholder loans funds to a corporation and his predominant motive in making the loans is to prevent it from going ot of business and thereby terminating his employment, such loans are made to protect his trade or business. [5] It is petitioners' position that the corporations were organized in the first instance predominantly to provide him with a salaried position rather than as an investment and that this intent never varied. We believe that both motives, that of protecting his investment and that of protecting his employment, are involved here. The determination *90 of which of these was petitioner's dominant motive is essentially a factual inquiry, with the burden of proof on petitioner. Smith v. Commissioner,55 T.C. 260 (1970), remanded for consideration in light of Generes at 457 F.2d 797 (5th Cir. 1972), opinion on remand 60 T.C. 316 (1973). We are aware that the fact that petitioner did not receive a salary except in 1968 tends to reduce the likelihood that his employment status was the dominant motivation behind the loans. [6] We are also cognizant that a loan motivated by one's status as an employee seems more plausible where its objective is to protect a present salary, rather than promote a future one. Putoma Corp. v. Commissioner,66 T.C. 652, 674 (1976), affd. 601 F.2d 734 (5th Cir. 1979). Nonetheless, we believe the weight of objective evidence supports petitioner's testimony, which we find credible, that he established the corporations predominately in order to provide himself with a salary rather than for dividends or appreciation in value. Petitioner's investment *91 in the SHS corporations by 1970, including loans, totaled $65,000 in SHS-New York and $60,000 in SHS-Long Island. We do not believe these investments are substantial in comparison to the salaries petitioner clearly expected to earn. [7] Moreover, the proper comparison would not be the actual amount invested, as respondent contends, but the value of petitioner's interest at the time the loans were made. The record does not provide any basis for an accurate finding of such value but we note that the corporations had been unprofitable from the start and business declined rapidly in 1970. SHS-New York ceased business in late 1970 and SHS-Long Island in 1971. It is doubtful, therefore, whether the corporations were worth petitioner's original investment in them. We also believe it significant that petitioner had no salary from any other sources nor had other means of support except for his savings and loans he secured. Unlike the taxpayer in Generes, petitioner apparently had no substantial *92 income from other sources and devoted his full time and efforts to the SHS corporations. [8]
We find that petitioner has met his burden of proof and has shown that his predominant motive in making the loans was to protect his salary. Decision will be entered for the petitioners. Footnotes
1. All statutory references are to the internal Revenue Code of 1954, as in effect during the taxable year in issue.↩
2. SEC. 166(d) NONBUSINESS DEBTS. -- (1) General Rule. -- In the case of a taxpayer other than a corporation-- (A) subsections (a) and (c) shall not apply to any nonbusiness debt; and (B) where any nonbusiness debt becomes worthless within the taxable year, the loss resulting therefrom shall be considered a loss from the sale or exchange, during the taxable year, of a capital asset held for not more than 6 months. (2) Nonbusiness Debt Defined. -- For purposes of paragraph (1), the term "nonbusiness debt" means a debt other than-- (A) a debt created or acquired (as the case may be) in connection with a trade or business of the taxpayer; or (B) a debt the loss from the worthlessness of which isincurred in the taxpayer's trade or business. ↩
3. SEC. 166. BAD DEBTS (a) General Rule. -- (1) Wholly Worthless Debts. -- There shall be allowed as a deduction any debt which becomes worthless within the taxable year. (2) Partially Worthless Debts.↩ -- When satisfied that a debt is recoverable only in part, the Secretary or his delegate may allow such debt, in an amount not in excess of the part charged off within the taxable year, as a deduction.
4. That petitioner returned to the education field as an administrator full time is not inconsistent with our finding that he was an employee of the corporations. We infer that petitioner returned to the education field because he had been unable to draw a salary due to the corporations' lack of profits, not because he no longer desired to work for the corporations.↩
5. See Mann v. Commissioner,T.C. Memo 1975-74; Haslam v. Commissioner,T.C. Memo 1974-97; Young v. Commissioner,T.C. Memo 1974-76↩.
6. See Fitzpatrick v. Commissioner,T.C. Memo. 1978-27↩.
7. Ramirez earned between $15,000-$18,000 in 1969 and Silvestri was supposed to draw about $200 per week. Petitioner could reasonably expect to earn more than either of these employees.↩
8. Giving one's full time to a corporation does not, of course, in inself mean all actions are in the course of one's trade or business as an employee. Whipple v. Comissioner,373 U.S. 193↩ (1963).