EUGENE V. AND FRANCES M. MILLER, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Miller v. Commissioner
Docket No. 890-77.
United States Tax Court
T.C. Memo 1978-304; 1978 Tax Ct. Memo LEXIS 210; 37 T.C.M. (CCH) 1264; T.C.M. (RIA) 78304; August 7, 1978, Filed *210 Petitioners advanced sums to a corporation in 1967 and paid out further amounts under guaranty and indemnity agreements in 1972. Held, petitioners are not entitled to a 1972 bad debt deduction for the 1967 payments since they failed to establish the debt created thereby became worthless in 1972. Held further, petitioners are entitled to a 1972 nonbusiness bad debt for the amounts expended in 1972. Kenneth C. Ellison, for the petitioners. J. Michael Adcock, for the respondent. WILES
MEMORANDUM FINDINGS OF FACT AND OPINION WILES, Judge: Respondent determined a $ 6,254.80 deficiency in petitioners' 1972 Federal income tax. After concessions, the two remaining issues are whether petitioners are entitled to a 1972 business bad debt deduction for $ 31,607.06 paid in 1967 and $ 84,340 paid in 1972. FINDINGS OF FACT Some facts have been stipulated and are found accordingly. Eugene and Frances Miller, husband and wife, were residents of Stark City, Missouri, when they filed their petition herein. Petitioners filed their 1972 income tax return with the District Director of Internal Revenue, Ogden, Utah. Eugene Miller (hereinafter petitioner) was a practicing attorney in Fairbanks, *211 Alaska, from November 3, 1953, until November 1976. In 1962, petitioner formed a partnership with Lenny Arsenault, a licensed plumber. Arsenault was to contract out his plumbing skills and petitioner was to perform the legal work related to the business operations. On February 26, 1963, the partnership was incorporated as Globe Plumbing and Heating, Inc. (hereinafter Globe) with petitioners and Arsenault each owning 50 percent. As Globe's plumbing contract bids grew in size, its work was required to be bonded. In 1966, as a condition to obtaining bonding for Globe's work, United States Fidelity and Guaranty Company (hereinafter U.S.F. & G.), and others, required petitioners to personally execute agreements indemnifying them on all amounts expended on any guaranty for Globe. Petitioners' purpose in executing the indemnity and guaranty agreements was to enable Globe to obtain the necessary bonding so that it could conduct business. Globe never paid petitioners a fee for the execution of any guaranty or indemnity agreements. Petitioners have never been engaged in the trade or business of guaranteeing debts or obligations of corporations. In 1967, severe weather damaged Globe *212 contract plumbing projects on which U.S.F. & G. had outstanding guarantees. Since Globe was not financially able to complete the projects, U.S.F. & G. and others were required to pay out approximately $ 200,000 to complete Globe's work. Through the above agreements, petitioners were obligated to pay this amount. In addition, petitioners personally expended $ 31,607.06 in 1967 in an attempt to assist Globe in finishing these projects. Petitioners' purpose in advancing the $ 31,607.06 was to enable Globe to complete its contracts. The minutes of an April 30, 1967, meeting of Globe stockholders reflect that Arsenault and E. Robert Horn wished to purchase petitioners' Globe stock. On November 1, 1967, the parties executed a sales agreement providing that in consideration for petitioners' stock, Arsenault and Horn were to: (1) assume and pay all Globe obligations which petitioners indemnified; (2) hold petitioners harmless from any obligation through their association with Globe; and (3) reimburse petitioners for any cash outlays they had incurred for the operation of Globe in the spring and summer of 1967. If Arsenault and Horn could not perform these conditions, petitioners' stock *213 was to be recoveyed to them. Arsenault and Horn never satisfied the conditions of the agreement thereby nullifying the sale. Globe ceased doing business prior to January 1, 1968. Arsenault declared bankruptcy in 1972. On November 8, 1972, petitioners executed an agreement with Globe's bonding companies wherein they agreed to pay $ 80,500 to the companies if they agreed not to sue petitioners for any amounts relative to petitioners' guaranties and indemnities for Globe. Petitioners deducted the 1967 payments on their 1972 return as a business bad debt under section 166. [1] The 1972 payment of $ 80,500 was deducted as a nonbusiness bad debt on the 1972 return but, in an amended petition, petitioners assert that this amount is also a section 166 business bad debt. Respondent disallowed the $ 31,607.06 business bad debt loss on the ground that it did not become worthless in 1972 and contends here that the $ 80,500 is a nonbusiness bad debt. [2] *214 OPINION We must determine whether 1967 payments of $ 31,607.06 and 1972 payments of $ 80,500 constitute business bad debts in 1972. Petitioners contend these amounts were expended to protect petitioner's legal reputation in Fairbanks, Alaska, where he practiced law. Respondent contends that these sums were advanced to prevent a larger contingent liability from accruing under petitioners' guaranty and indemnity agreements with Globe's bonding companies; that the $ 31,607.06 was worthless prior to 1972; and that, therefore, petitioners are entitled only to a $ 80,500 nonbusiness bad debt in 1972. Sections 166(d)(1) and 1222(2) allow an individual shareholder a short-term capital loss for nonbusiness bad debts resulting from worthless corporate loans which are not evidenced by a security. Section 166(a)(1) allows an ordinary deduction for any business bad debt which becomes wholly worthless within the taxable year. The term "debt" as used in section 166 includes *215 the loss sustained by a guarantor of a corporate obligation. Putnam v. Commissioner,352 U.S. 82, 85 (1956). A loss within the framework of sections 166(a)(1) and 166(d)(1) must be taken in the taxable year in which the worthlessness occurs. Boehm v. Commissioner,326 U.S. 287, 292 (1945). Worthlessness is a factual question. Sec. 1.166-2(a), Income Tax Regs.
Whether a debt is business or nonbusiness is a question of fact; business bad debt status is only found where there exists a "proximate relationship" between the bad debt and the taxpayer's trade or business. Sec. 1.166-5(b)(2), Income Tax Regs. This proximate relationship is only found where the taxpayer establishes that the dominant motivation behind the loan or guaranty payment was business related. United States v. Generes,405 U.S. 93, 102 (1972). The issues are factual. Each case must be decided on the record presented. Respondent has determined that the dominant motivation of the 1967 and 1972 pyments was to minimize petitioners' losses and potential liability in Globe, and that the debt created by the 1967 payments became worthless in a year prior to 1972. Petitioners have the burden of proof to establish otherwise. *216 Welch v. Helvering,290 U.S. 111, 115 (1933); Rule 142(a), Tax Court Rules of Practice and Procedure.
We need not determine the character of the debt created by the 1967 payments totalling $ 31,607.06 since we find the debt was worthless prior to 1972. In 1967, petitioners advanced Globe $ 31,607.06 so that it could complete certain bonded plumbing contracts. [3] On November 1, 1967, petitioners agreed to sell their Globe stock to Arsenault and Horn providing they agreed, among other things, to personally reimburse petitioners for the $ 31,607.06 in advances. Under this agreement, petitioners argue they had a reasonable expectation of reimbursement from Arsenault and Horn until 1972 when Arsenault declared bankruptcy. We disagree. The sales agreement itself was conditioned upon the purchasers' performance of certain acts. If they were unable to perform, the sale was to be nullified. Globe ceased doing any business prior to January 1, 1968. Although the November 1, 1967, agreement placed no time limit *217 on the purchasers' performance, it is certainly reasonable to expect that they would not complete performance, thereby paying large sums of money for petitioners' stock, when the corporation ceased doing business. We are not required to identify precisely when petitioners could no longer reasonably anticipate payment by the purchasers, but it certainly was prior to 1972. On January 1, 1972, Globe had been dormant for over three years. Under these circumstances, we find that prior to January 1, 1972, petitioners should have looked only to Globe for repayment. Since the corporation was dormant for over three years, certainly the debt was worthless before January 1, 1972. Accordingly, on the basis of the record before us, we find the $ 31,607.06 debt created by the 1967 payments was worthless prior to 1972. We must next determine the character of the 1972 payments of $ 80,500 made under a guaranty and indemnity agreement. The payment of this amount created a debt on behalf of Globe to petitioners. Putnam v. Commissioner,supra.Petitioners argue the dominant motivation for the payments was to protect petitioner's legal practice in Fairbanks, Alaska. They support this by arguing *218 that the 1972 payments were made voluntarily since the Alaska six-year statute of limitations on contracts ran on the guaranty and indemnity agreements. [4] Respondent asserts that the statute had not run; that in return for $ 80,500 in payments petitioners obtained a covenant not to sue on a liability of approximately $ 200,000; and that, therefore, the dominant motive for the payments was to minimize petitioners' liability exposure in Globe. We agree with respondent. No doubt petitioner's legal practice in Fairbanks benefited from his not being sued but we simply are not convinced that this was the dominant motivation for the payment. Petitioners' $ 200,000 liability exposure on the guaranty and indemnity agreements is not disputed. Absent the November 8, 1972, covenant not to sue agreement, no doubt petitioners would have faced a $ 200,000 liability. Under these circumstances, we are convinced the dominant motivation for the payments was to minimize liability exposure in Globe. See Smith v. Commissioner,60 T.C. 316, 319 (1973). Finally, we are not persuaded by petitioners' argument that the payments were voluntary since the statute of *219 limitations had run. The statute of limitations on an indemnity contract does not begin to run when the contract is executed; it begins when the cause of action accrues to the indemnitee which is when it pays the money. Howarth v. First National Bank of Anchorage,540 P. 2d 486, 490-491 (Alas. 1975), affd. on rehearing, 551 P. 2d 934 (Alas. 1976). Accordingly, on the basis of the record before us, we conclude that petitioners sustained a nonbusiness bad debt of $ 80,500 in 1972. To reflect the foregoing, Decision will be entered for the respondent.
Footnotes
1. Statutory references are to the Internal Revenue Code of 1954, as amended. ↩
2. Petitioners deducted $ 84,340 on their 1972 return as nonbusiness bad debts and, in their amended petition, claimed this amount was a business bad debt. Since petitioners presented evidence only as to $ 80,500 of this amount, we conclude that the remaining $ 3,840 is a nonbusiness bad debt. Welch v. Helvering,290 U.S. 111, 115 (1933); Rule 142(a), Tax Court Rules of Practice and Procedure.↩
3. The parties have assumed, and we do not question, that these advances created a bona fide debt from Globe to petitioners within the meaning of sec. 1.166-1(c), Income Tax. Regs.↩
4. Alaska Stat. Tit. 9, sec. 050 (1962).↩